Case 23-5965 Correnia Profitt et al. v. Highlands Hospital Corporation et al. Arguments not to exceed 15 minutes per side. Mr. Bolag, you may proceed for the appellant. Good morning. Morning. I'm Eric Bolag. With me is Todd Greer. We represent the plaintiffs in this case. This appeal is against the United States of America. You have five minutes you're doing, rebuttal? A five-minute rebuttal, sir. Okay, very well. Our first argument that we want to present this morning is for the denial of the second amended complaint, which we believe pursuant to Rule 16b was absolutely appropriate and timely and showed diligence. We think the standard of 16b is a we understand. It's part of it. It is part of it. So, I mean, Rule 16 is law. You know, it's not like just up to the district court and you have to make that showing that's specified in the rule. So why do you think you made it when you're moving to amend long after discovery had closed? So, our movement to amend is not after all of the discovery had closed. It was after fact discovery had closed. But this is a case in which when you look at it from a diligence perspective, this case was in the teeth of COVID. It's a medical malpractice case in the COVID. The United States didn't file their answer in this case until February of 2020. Between the time that we sought to move for leave for the second amended complaint, we took 35 depositions and there was over 200 filings in the case. All of that taking place starting in the after the United States entered the case through the time of moving. Can I ask you just about your diligence question? Because my understanding when I was a district judge is how plaintiffs typically litigated this. You talk a lot about, well, lawyers can't figure this out. I don't disagree with you on that. But it seems to me usually if you're doing a med mal type case, you have a consultant, whether it be an expert or someone else in the medical field that will look at the records. I mean, Dotson's all over the records from what I saw and will look at the records and the circumstances surrounding the very unfortunate passing of the baby and try and figure out anyone who touched them whether they did anything wrong. In fact, in your first amendment complaint, you make allusions to this in paragraphs 14 and 42 that there's much more to this. How can we find diligence if you haven't done the basic steps? You use interrogatories, requests for admissions, all those things to obtain it. In fact, one of the interrogatory responses indicates the intubation and that there was a pediatrician involved and that Watson did the intubation and all that. Certainly, Your Honor. Starting with the first question of why don't you have an expert or series of experts that are going to sooner be able to articulate what the particular acts of negligence are, I have two responses. The first response is the type of expert that identified the deviations was not able to make, he was an intensivist, a pediatric intensivist, who was, you know, testified and it's in the record. He was not able to determine who intubated the baby, who was responsible for... Well, it says in the interrogatory response that Watson did. What it actually, I believe, said, Your Honor, is that it was per Brenda Watson that the medical record refers to now. That doesn't mean that... Okay. Can I ask, I'm sorry to interrupt you, but if it's per Brenda Watson, and I saw the debate about per, I get that. Why not a request for admission or an interrogatory specifically related to that? Or you depose Brenda Watson right at the outset and figure that out? In other words, there seems like... And one of the things Judge Caldwell, I think, points out is there's a lot of things you could have done. And it seems to me what you argue in your brief is when Dotson told us she was negligent, we wanted to sue her. There were two components of this case. There was a component about the OB, the OBGYN care that was received on January 2nd and January 3rd. And then there's a component about the post-delivery care, the resuscitation, what we would refer to as the botched resuscitation. Looking at the medical record, I've done medical work for an awfully long time, that reading the record in and of itself, no one could tell who did what to this baby who was responsible in the resuscitation component for measuring and making sure the tube is in the right place, making sure that there was imaging confirmation to pull the tube back, making sure... And these are things that are supposed to happen pursuant to a standard of care. Once the tube goes too low on the right side... Dr. Eric Green I'm sorry to interrupt you. I saw that. I agree with you. But this is where I'm just having a hang up. I'm just being candid with you. You say, these are things we couldn't figure out. To me, that's what interrogatories and requests for admissions are for, that help you clarify what's in the record. Dr. John Aucott I would say that diligence is not a perfection standard, that diligence is a reasonableness. Dr. Teri Manolio Well, counsel, let me just ask you, I know that you've got a couple of other issues that you want to address here, but I just have one more question on the diligence. I completely understand what you're saying in terms of this evolving, you're doing depositions, you're learning more as you go along. But I guess what I don't understand is, you get to the point where you want to amend, and this is after you've actually deposed Dotson, but why not earlier, once you're realizing that, gosh, this is a lot of information that's coming in, we haven't buttoned this down, you've got these unknown defendants that you've named in the complaint, why didn't you simply ask for additional time to amend? The court had actually set a date by which amendments were to be made. You blew by that date, you waited until you get this, what you consider almost to be an admission by Dr. Dotson, and then you say, aha, let's amend this now. Why did you not do that? I mean, how does that demonstrate diligence? Justice Breyer So, Your Honor, I think that's an excellent question, and there was the first scheduling order. By, and this is R-12, on 1-13-20, Judge Caldwell had struck all the deadlines. So the initial deadline for naming others was before the United States was even in this case. After the first scheduling order was struck down, there was no longer, none of the other scheduling orders had a deadline in place for filing an amended complaint. Justice Breyer So that's a deadline of October 1, 19, right?  Yes.  But you guys file, like, almost two years, you know, more than a year and a half later.  Well, again, so the United States is in the case for another six months. Okay, the United States gets When do they come in? Justice Breyer They came in February 14 of 2020. That's when they I mean, you know, with all these depositions and with, as Judge Tappar says, Dotson all over the records, I just don't understand why you weren't on inquiry notice to develop this and do interrogatories. I mean, usually you don't wait until someone has purportedly confessed negligence in a deposition to bring a claim. You bring the claim, you know, much sooner than that and then try to make out the negligence. We used reasonable efforts at an unreasonable point in our history. Getting our experts, who were professional medical providers in that time frame, when they were going 24-7 in hospitals dealing with COVID and COVID-related issues, was almost impossible. Finally, it was This is an area where, I mean, the district court was there throughout, and for us to second guess the district court's judgment about these kinds of circumstances, the difficulties of that time and so on, it's just, it's hard for us to do. But our point, sir, to that would be, in January of 21, our expert identified these pediatric related issues. The medical record, the fact that the name is mentioned numerous times, doesn't say what she was in fact doing, wasn't saying what her responsibilities were, weren't saying. Do you want to take a minute and talk about another issue before we turn it over to the government and we won't charge you time-wise? Sure. Because I know we sort of, you know, held you up on this one. Okay. And as obviously you all are well aware, we have set forth in our pleadings and in our briefing, our rationale and all of the law that supports the positions that we're saying. I'll take the minute to deal with summary judgment. On Dotson again? Well, it wasn't on Dotson. Dotson was never a party here. Okay, go ahead. We sought to make her a party, but she was undoubtedly and undisputed an agent of the United States. Undoubtedly, she committed numerous acts of negligence, which she conceded, and we put all of those in the pleadings. Okay. She took and we would say was the primary factor in the resuscitation that we learned about what she did and what she didn't do in her deposition. And she conceded five or six acts of negligence. She said she deviated from the standard of care. She conceded that those deviations from the standard of care. Don't you have an exhaustion problem then? I mean, you didn't exhaust this. Well, actually, in our notice, we did not just say that Dr. Sammy Gibson, the OB, was the responsible party for what had occurred. What we said was the OB, we knew what her... We could tell what her acts of negligence were, so we identified her by name. But we also said other agents and responsible parties... Your SF-95? Yes, this is...  Yes. Doesn't that cut against your other argument? Like it seems like one argument's cutting against the other. If you were on notice in 2018 that others were involved, the same notice you're saying exhausted your claims because the U.S. should know, then how can we hold you at diligence? Because, sir, I would argue that diligence is pursuing the case, which we did. I would argue that diligence is not something that has to be done... But how is the U.S. on notice if you don't even know? The U.S. has access to their agents. The U.S. had access to Dotson. But as it relates to Dr. Dotson, okay, you could not look at this medical record and tell that she had botched the resuscitation. You would only know that after you spoke to her, after you deposed her, unless you had access to her. We did not have access to her. We tried in January of 21, we learned for the first time that there are questions about that pediatric care that need to be scrutinized. We then asked to depose her in the United States because we had already taken more than 10 depositions. Take 30 seconds and want to keep your rebuttal. Okay. The United States opposed us deposing Dotson. So that delayed us another four months to get us to April of 2021. Mind you, this trial was not scheduled for another full year. And as another point, and then... I think we got to leave it there. Yeah. You can, I mean, five minutes is a lot of rebuttal. If you want five, I think we got to leave it there. Let the United States go. Okay. Thank you. It's good it wasn't a glass of water. That's right. I always say stop when they bring up the water. Thank you. That's what happens. It was just a pencil. Better to have a pencil. Thank you, Your Honor. May it please the court, Ben Lewis for the United States. At counsel's table is Cheryl Morgan and Tiffany Fleming, who are part of the U.S. Attorney's Office in the Eastern District of Kentucky. Picking up off a question that Judge Depar asked, I think that the tension in this case reflects that plaintiffs are trying to thread a needle that can't be thread. They're arguing that the medical records show that the government was on notice of the Dr. Dotson's negligence, while they're also arguing that they weren't on notice themselves. And they're arguing that that kind of lack of notice shows that there wouldn't be any prejudice in this case. That's simply not a needle that can be thread. And we think the medical records remain the same throughout this case, and that they clearly reflected that there was a pneumothorax that had been experienced by the child, and that that pneumothorax had been discovered at the time that the air tube was adjusted. And so in that respect, there was no abuse of discretion from the district court in handling the leave to amend the Second Amendment claim. And we think that there was certainly no error, clear or otherwise. Sorry to interrupt you, but should the fact that the claim appears meritorious factor into that at all? Two responses to that, Your Honor. I think one, kind of on its own terms, and two, a legal answer. First, I think that plaintiffs overstate the significance of this testimony on its own terms. Dr. Dotson here, she was not qualified as an expert and was not testifying as an expert. The standard of care is not subjective, it's objective. And I think everyone agrees that that determination of what constitutes the standard of care would be ultimately for the court. And beyond that, it's certainly only one element of the claim. It's not every element of the claim, and so there'd certainly still be questions of causation. But to answer your point more directly, I think it doesn't have much import in the case. In every case where a plaintiff seeks to amend their complaint, they're seeking to do so based on the fact that they've discovered facts or evidence that they think will be particularly convincing, and that doesn't go to their diligence in bringing the claim or to the prejudice that would be experienced by the party that's opposing that motion. So just under these circumstances, I think there's no reason that the fact that Dr. Dotson made some admissions during their testimony has any bearing on the kind of abusive discretion analysis here. Beyond that, I think I just want to make one point about the prejudice here and to clarify that even if plaintiffs, assuming they were diligent in bringing their claim, that the first thing the government would have to do is redepose everyone that was involved in the obstetrics case that they had been bringing for the first two and a half years of this everyone who had those people had knowledge of Dr. Dotson and her claim. They would have to introduce a new expert who was on pediatrics rather than obstetrics. All of that would have taken time. Fact discovery had taken a year, and all of that would have been amplified by the fact that there were multiple parties that still remain in this case. Remember, at this time, they were not only suing the United States for Dr. Gibson, they were suing Dr. Monaco, they were suing the hospital. All of that would have caused further delay. So there would certainly be prejudice here. To Dr. Gibson, I would rest on a brief unless the court has any questions about Dr. Gibson and the findings of facts and conclusions of law there. Well, I guess regarding whether Dr. Gibson took longer than she should have to perform the cesarean, one can look at this in the sense of whether within a certain period of time there seems to have been any time wasted. Is there a delay within a period of time, wherever that period of time might fall, if we're not sure where it fell exactly? Did she waste any time between when she shows up at the parking lot and when Corbin is delivered? Or we can look at just absolute numbers and say, well, this happened at, what was it, like 3.20 and this happened at 3.25. How do you look at it? Are you looking at, because we have that machine they take the lidocaine out of. Do you think we ought to be looking at those indicators or more like the district court where she does a narrative and says there's just no time wasted from the time when Gibson runs up the stairs to delivery? I think the district court did things right here and specifically it relied on expert witnesses, independent bases for why Dr. Gibson was within the standard of care here. So the government's expert here testified that it was within a reasonable amount of time for her to do what she did do and so the government lawyer walked the expert witness through exactly what Dr. Gibson had done under these circumstances, run up the stairs, put on her gown, scrub, get the lidocaine, apply the lidocaine and do the injection and do the C-section very quickly and said, would that be within the standard of care? The answer was yes. But in addition, it was within the standard of care kind of independently because no matter how much time it took, there was no time wasted. There was no unnecessary step that she could have done. So here, there's nothing, no one disagrees, I think, that if Dr. Gibson had showed up in the operating room and there was a general anesthesiologist actually there, that she could have applied the general anesthesia. So there's no question that she could have taken the time she did to apply the local anesthesia. She was pretty upset that Dr. Monaco chose, I think is the right word, not to show up, correct? Yes. And ultimately in this case, Dr. Monaco settled with the plaintiffs. He said he didn't think he was needed, so he didn't show for that reason? I don't want to, you're getting a little bit beyond my knowledge of the record on exactly why Dr. Monaco represented. Okay, I guess it's not relevant. But I guess the- She's dealing with that though, you know, that- Yes, she shows up in the operating room- The person who's supposed to, you know, handle that part of this situation didn't show. And as the government's expert I think says, even if there were some moments that she had to take the time to decide what to do or to make a split second decision about to handle that situation, that that was perfectly within the standard of care for her to decide to do what she did. So in general, I would just encourage the court to do what the district court did here, which is to take these emergency circumstances and to really look closely at what the expert testimony established rather than try to do a freestanding analysis of what kind of makes common sense to do under these circumstances. I think these are circumstances that require a great degree of medical judgments and they were happening very quickly. Those emergency circumstances were present during the C-section itself. They continued after the C-section. And we would encourage this court to do what the district court did. Speaking about after the C-section, I do have one question regarding the pain medication or lack of anesthesia after the delivery. So I think the district court made a factual finding essentially based upon the testimony of Dr. Gibson that it was her perception that Nurse Watson was not available to perform any or give any anesthesia or pain medication at that time. Of course, Nurse Watson's testimony was that she offered to do that. When we look at that record, are we to assume that there was just a credibility determination by the district court? Or how should we deal with that? So the factual finding was that Dr. Gibson had observed that she was occupied with resuscitation of the child. I think that factual finding, there's no question that that was well supported by the record. Dr. Gibson herself testified exactly to that. And so plaintiffs submit deposition testimony from Nurse CRNA Watson who did not testify at trial where there was a colloquy between, she claims there was a colloquy between her and Dr. Gibson. I think that that testimony is a bit beside the point. There's no question that under those circumstances, I guess what critically that deposition testimony does not say is that she was not, did not have her hands full, that she was not necessary, not helpful to resuscitating the child. And there's no question that- So you think there's no conflict between those two things, in other words. Is that what you're saying? One, yeah, one response is that, my first line response is that there's no conflict between those two things and that Dr. Gibson's, I think, testimony was well supported for and served its purposes for what it was meant for. I guess the second, if there is, you determined that there is some conflict, I think that there is, it's perfectly permissible for the district court to say we believe Dr. Gibson over kind of this hearsay deposition testimony from Nurse Watson who did not testify at trial. So I think either of those, again, those would be independent bases to uphold that factual finding here and so we're talking about a clear error standard and I think that even the presence of some deposition testimony on that point that the district court didn't kind of expressly address line by line wouldn't go to show any of the kind of clear error that would be required to overturn the judgment here. If there are no further questions, we ask this court to adjourn. Okay, thank you for your argument. We'll hear rebuttal. I'll start with the last point, Judge Davis, which was to your question. This was not hearsay testimony from Dr. Watson. This was stipulated to by the parties that Dr. Watson had actually, after the delivery and when she was done and her only involvement in the intubation of Corbin was the intubation and then she was done providing any care and treatment, turned it all over to Dr. Dotson, she approached Dr. Gibson. She said, do you want me to put her out? And Dr. Gibson said no. And that's the testimony and that's the answer. And for that reason, for 35 more minutes. I thought she said to the nurse, not doctors, it's Nurse Watson, right? Nurse Watson, yes. I thought she said, no, I want you to prioritize Corbin's resuscitation right now. And part of the problem, again, is Monaco's not even there. He's MIA because he's not answering his phone and everything else. So Gibson's dealing with less than a perfect circumstance because of Monaco's negligence. And she says, look, we got to resuscitate this baby. So that's, at least that's what I understood. And if I may, Nurse Watson's involvement with the resuscitation had been completed. Nurse Watson offered, after she had finished dealing with Corbin, she came to the doctor and said, should I put her out? Can I put her out? And Dr. Gibson, for reasons known only to Dr. Gibson, said no. And her answer was no. And from there, for the next 35 minutes, Dr. Gibson held Ms. Proffitt closed with her hands while she was in agonizing pain, instead of having allowed Nurse Watson to administer that. And all that testimony came out in trial. And we believe that the judge's conclusion, or she actually didn't address that particular piece, I believe, in her findings, fact, conclusions law, is error. It's undisputed, this opportunity. I understand what you're saying. I mean, the district judge specifically says that the record's clear, that Dr. Gibson saw Watson attending to Corbin after his birth, and that Gibson needed to prioritize the resuscitation of Corbin. That's the district court's finding. You know that. You just said that. What page ID would you give us for this? Just so I know exactly what you're referring to, to this admission or stipulation that Watson's all done and offers to transition now to help Ms. Proffitt. I will find that for you as I continue to argue, and I will give you that response. I mean, where in is it found? Yes. I mean, it's not in the deposition, her death. Is it Watson? It's in the stipulation that was read into the record at trial.  All right, go ahead. And we'll find that. There was another question that, sir, you raised, which was as it relates to the time of delivery. Yes. Okay. This work gives a very kind of streamlined narrative about, you know, when she arrives and like the actions that she is taking and whether there is any wasted time in that interval, whether that interval starts at 3.20 or 3.25 or whatever. It's undisputed that Dr. Gibson testified that when she got the call at 2.58, she knew she was dealing with an absolute emergency, likely a placenta. Where did she waste time since you're low on time? When she got there at 3.20, she did nothing until 3.25. How do you know that? Because she testified at trial that she conceded at her deposition at trial that between 3.20 and 3.25, she was waiting on Dr. Monaco to arrive at a time where she knew that every second and every minute. She's doing nothing, you know. I mean, one can easily reconcile that statement with the district court's findings that she's doing many other things, but she's also waiting for this guy to show up, which he never does. Well, not until 4. So when every minute and every second counts, you can wait, but you don't wait. When you know, Stan, she could be waiting in a sense while she's doing other things like getting her scrubs on, sterilizing her hands, et cetera. And those are the things the district court described. So the testimony at trial was that she conceded at her deposition. She said between 3.20 and 3.25, she was waiting on Dr. Monaco, waiting on Dr. Monaco. She then said at trial that she would explain why and what else might have been happening between 3.20 and 3.25. And the judge said to the witness that Ms. Fleming will ask you about that. And there was never any follow-up questions to fill in what her deposition testimony was and that she conceded she said, but wanted to further explain, but never further explain. And I would suggest that two things can't be true. Every minute and every second count, and you know that every second of oxygen deprivation is causing brain damage. And at the same time, the government opinion witness says that 10 minutes is fine when the undisputed testimony was that you have no more than six minutes without oxygen until the neonate, the infant, is beyond recovery. And so when she gets there at 3.20 and she knows then that there's no heartbeat, so there's no way that there's oxygen perfusion, okay, the our opinion witness says you go, it's go time, you don't wait for anything. But the testimony of 10 minutes is an appropriate amount of time when you only have six minutes. I mean, what matters is whether she wasted time, not what the number really was. It could have been 30 seconds, and if she doesn't fail, if she fails to meet that, it doesn't mean she's negligent. But the record does concede, sir, that she, between 3.20 and 3.25, was simply waiting. Well, I'll tell you what, why don't you take a minute to wrap up. We can find in the trial record the stipulation if you don't have that with you. But take a minute, since the red light's on, to kind of sum up your argument. It's the appellant's position that not only was there appropriate diligence done, which would have satisfied any analysis relating to the should they or should the second amended complaint have been granted, must be granted leave for it. And the only perceived here was speculative prejudice was speculative prejudice. And the Sixth Circuit has said consistently that delay by itself is not enough. Delay by itself is not enough. And what you have to show diligence. It's a legal requirement. The court, I mean, I've written an opinion to this effect. If reversing a district court, that was cavalier about diligence. It's a legal requirement in Rule 16. It's not like this is some largess that's always available to the district court. And I've read your opinion, sir, and I'm certainly not bickering with your opinion. What I'm saying is that taking 35 depositions during COVID and filing 200 pleadings and looking at a medical record is the epitome of diligence. It depends. I mean, it's not just that you're doing a lot of stuff. But anyway, I didn't mean to interrupt you. Go ahead.  And as it relates to the summary judgment and judge the part to your question of exhaustion, the requirements of 2675 are met if the claimant gives the agency written notice of his or her claim sufficient to enable the agency to investigate in places of value on his or her claim. And we believe that our form 95 and our first amended complaint, which references that there were other actors here, other agents, does satisfy that. And once we do that, we believe that no one has said what would have caused delay. The concept that you'd have to re-depose Dr. Dotson and that Dr. Dotson could not specifically concede, she's a board certified pediatrician. She doesn't understand what the standard of care required. She absolutely understood it. She absolutely testified to it. And she absolutely testified that she deviated from it. Okay. Well, I think we've got your argument on the diligence and the amendment and the summary judgment. And I think we've given you plenty of time. So. We plaintiff greatly appreciates all of your time. I can assure you that we are very carefully working our way through this case and have been. So we thank you both for your arguments this morning. It's obviously an important case in a tragic circumstance. And we're taking it seriously. Thank you very much. Thank you. The case will be submitted.